### J. J. Davis v. The State.

#### No. 5084. Decided November 27, 1918.

**Murder—Sufficiency of the Evidence—Charge of Court.**

Where, upon trial of murder and a conviction of said offense, the evidence was sufficient to sustain the same under a proper charge of the court, there was no reversible error, and the court properly refused defendant's requested charges, which were not applicable to the facts.

Appeal from the District Court of Harrison. Tried below before the Hon. P. O. Beard.

Appeal from a conviction of murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Brown & Hall,* for appellant.—On question of the court's refusal to give defendant's requested charges: Weaver v. State, 76 S. W. Rep.. 564; Pryse v. State, 54 Texas Crim. Rep., 523, 113 S. W. Rep., 938; Walker v. State, 156 S. W. Rep., 206; Hassell v. State, 80 Texas Crim. Rep., 93, 188 S. W. Rep., 991.

*E. B. Hendricks,* Assistant Attorney General, for the State.

PRENDERGAST, JUDGE.—Appellant was convicted of murder with the lowest penalty assessed.

The evidence shows that appellant was a "cropper" on the deceased, J. D. Benson's, farm for a part of the year 1917. That the contract when appellant went on Benson's farm was in effect that appellant was to cultivate a certain part of Benson's farm and that they were to share equally in what he raised, one-half to Davis and one-half to Benson, and that Benson was to haul the cotton picked by Davis off of the place to the gin. The effect of the contract between them, as stated, was that Davis was a c"ropper." Rogers v. Frazier, 108 S. W. Rep., 727; Rogers v. McGuffey, 96 Texas, 565; Doke v. Railroad Co., 126 S. W. Rep., 1195, and several cases therein cited.

Davis, before the cotton was picked, had mortgaged his part. He claimed that about the time he had picked the first bale, it seems, that he and Benson had an agreement by which Benson was to take the first bale, he the second, Benson the third and he the fourth, but that Benson was to, himself, haul all of the cotton to the gin.

Mrs. Benson, the wife of deceased, swore that her husband and Davis did not agree to divide the cotton as claimed by Davis, but that instead Benson was to haul all the cotton to the gin and when the cotton was sold they were to divide the proceeds equally between them. That one reason that they did not agree to divide the cotton as stated by Davis was that one bale might contain more cotton than another, and hence instead of dividing the cotton in bales alternately they were all to be sold and the proceeds divided, as stated. In any event, that Benson was to haul all of the cotton to the gin. She and Davis agreed on that point.

The testimony agrees that Benson did haul the first bale to the gin. Davis claimed that he tried to get Benson to haul the second bale, his bale, as he called it, but that Benson failed or refused to do so. This was explained on Benson's part by the fact that at the particular time when Davis wanted him to haul it he was engaged in a contract for hauling cotton seed for others, and could not at that particular time haul the second bale to the gin. Davis, it seems, got a wagon and team from a neighbor and himself hauled it or had another to haul it for him. When the third bale was picked and ready to be hauled, Benson hauled that to the gin. Benson claimed that after that bale was loaded on his wagon, some time that night, Davis stole some hundred pounds off of the wagon and that when he got it to the gin it lacked some hundred pounds of being a bale. Benson also claimed that Davis had stolen some of his part of the corn of that crop and had had Davis arrested for these claimed thefts.

When the fourth or last bale was about picked Davis went off in the neighborhood somewhere and got a neighbor's wagon and team to haul it to the gin. Just as he was approaching the place with this wagon and team Benson met him, and finding out what he proposed to do, forbade him to do so and would not let him haul the cotton, stating

that he, Benson, would haul the cotton. Trouble arose at this point between the parties and Davis claimed that Benson used such language to and toward him at the time as to be guilty of an offense. He returned the team and wagon he had gotten, went to a small town some few miles distant, made a complaint against Benson for using abusive language to him and had a warrant for his arrest issued on that complaint.

Further instances of trouble between Davis and Benson were shown. A considerable state of hostility existed between them. It is unnecessary to give these various instances. This last trouble about hauling this last bale occurred between Benson and Davis in the morning. The killing occurred that evening.

That evening Benson and his wife and little boy went on their wagon to get the bale of cotton that appellant had picked, for the purpose of hauling it to the gin. Benson sent his son up to Davis' house to get Davis to come down and help them load the cotton. Davis was not at home. It seems at this time he had gone to town to file the complaint against Benson as stated and have the warrant issued for his arrest. Mrs. Davis tried to phone and get Mr. Davis. It seems she went to a neighbor's to phone but failed to get him. Either this neighbor where she tried to phone or some others learned that Mr. Benson had gone to haul the cotton and that appellant's wife, Mrs. Davis, was trying to get Davis over the phone. Some of them started to town that evening, met Davis, told him these facts, and told him that Benson was loading the cotton. Mr. Davis' little boy was along with him, it seems, on this occasion and had a shotgun. Mr. Petty swore that "When Jackson told Davis that Benson was loading the cotton, Davis reached over and took the gun from his boy and said he bet Benson would never load any more cotton." He then went to where the killing occurred.

Mrs. Benson testified that after they had loaded the cotton and were hauling it to the gin, and after they had got a right smart distance from where they had loaded it, Davis met them. That he drew his gun and presented it on her husband and asked her husband: "Do you know whose bale of cotton that is?" Her husband replied: "Mine and yours." She then testified as follows: "I said, 'Mr. Davis, please don't shoot.' I jumped in his (her husband's) lap and said, 'Don't shoot him, Mr. Davis, please don't.' He raised his gun a little higher, I raised a little higher in my husband's lap. Mr. Davis snapped the gun, taken it down and fixed it to make it shoot. I said, 'Oh, Mr. Davis, please quit, please quit.' He walked around, I was begging with him to quit; I said, 'For God's sake, think of yourself and little ones and think of me and mine and please don't shoot him.' He walked around to the side of the wagon. I threw my arm over his body and he shot him between my arm and the body. Mr. Davis said: 'Now you see what you got into.' He taken out yellow shell, I disremember whether he put it in his pocket or dropped it on the ground, went to put in another—I jumped off the wagon and reached back and got the ham-

mer; I said, 'If you shoot again I will mall your brains out,' and he ran. My husband said, 'Oh Lordy, he has killed me.' "

The uncontradicted proof showed that deceased was not armed. That he merely had a small pocketknife in his pocket closed. The testimony of Mrs. Benson and her son, who was present, showed clearly that deceased made no demonstration in any way toward Davis. In other words, disproved any claimed self-defense on Davis' part.

Davis swore in substance that when he met deceased on this occasion he tried to talk him out of going on with the cotton and asked him if he knew what he was doing, and that deceased used insulting language to him and told him that it was his cotton and he would be sure to keep it, and that the deceased then told his wife to get out of the way and he would fix the old son-of-a-bitch, and that he then shot deceased in self-defense. And he claimed that it was about two or three minutes from the time he first met him on this occasion until he shot deceased. Further, he said he did not know whether he intended to kill him when he snapped the gun at him or not but "was trying to protect my cotton and my life, both I suppose; I thought I had the right to protect my life or my cotton." Appellant also swore to some claimed threats made by the deceased against him.

The court gave a full, apt and correct charge submitting to the jury every issue that was raised by the testimony. The court properly submitted murder, manslaughter, self-defense, and self-defense predicated on threats. There was no complaint at all to the court's charge.

The only questions raised are to the court's refusal to give two special charges requested by him. Both of these were predicated on his right to kill the deceased to prevent the deceased from robbing him of said bale of cotton and to protect appellant's possession thereof. The evidence raised no such issue. On the contrary, it excluded the idea that the deceased was robbing or attempting to rob the appellant of the cotton.

The judgment is affirmed.

*Affirmed.*